774 So.2d 107 (2000)
STATE of Louisiana, in the Interest of C.J.K. and K.K.
Nos. 00-CJ-2375, 00-CJ-2504.
Supreme Court of Louisiana.
November 28, 2000.
Rehearing Denied January 5, 2001.
*108 Stephen A. Berniard, Jr., Lake Charles, for Applicant in No. 00-CJ-2375.
Kathleen Kay, Lake Charles, David Alexander Ritchie, Sulphur, for Respondent in No. 00-CJ-2375.
Kathleen Kay, for Applicant in No. 00-CJ-2504.
Stephen A. Berniard, Jr., Lake Charles, David Alexander Ritchie, Sulphur, for Respondent in No. 00-CJ-2504.
TRAYLOR, J.
We granted a writ of certiorari to determine whether the court of appeal correctly reviewed the trial court's ruling in a proceeding to terminate parental rights. We conclude that the court of appeal erred in reversing the trial court's finding by clear and convincing evidence that the children had been abused or neglected which had resulted in life-threatening and gravely disabling psychological injuries to the children. Accordingly, we reverse the judgment of the court of appeal and remand to the trial court for further proceedings on an expedited basis.

FACTS AND PROCEDURAL HISTORY
R.K. and J.K. were in a relationship for approximately eight years prior to January 1997, the last five during marriage. C.K., a male child, was born July 21, 1991, and K.K., a female child, was born November 2, 1992. According to J.K., R.K. began to frequently and violently abuse her the day they were married. Unfortunately, the children often witnessed this abuse.
J.K. obtained several restraining and protective orders against R.K. and attempted to have him arrested for the abusive behavior on numerous occasions. However, J.K. testified that R.K. often violated the restraining and protective orders. She further complained that sometimes the sheriff's department would not pick her husband up when he violated the court orders or when she reported his abuse. However, J.K. acknowledged that she repeatedly returned to R.K. after filing the protective orders, and failed to pursue contempt of court proceedings for his violation of the protective orders. Additionally, she acknowledged that no divorce proceedings were initiated.
On January 22, 1997, R.K. again became abusive toward J.K., but she escaped *109 to the Calcasieu Women's Shelter. She left the children with R.K., but when she returned, neither R.K. nor the children were present in the home. Some two weeks later, R.K. telephoned J.K. twice, informing her first that he had hurt the children, and then, that he had killed them. Actually, R.K. had spanked the children with a paint stick sufficiently hard to leave bruises.
Following the spanking incident, the children were returned to J.K. at the Calcasieu Women's Shelter. While at the shelter, the Sheriffs office responded to her complaint and took pictures of the children's injuries. Subsequently, she and the children went to stay with a friend. According to J.K., despite having a restraining order issued against him, three or four times a week R.K. would enter the property where she and the children were staying. Because law enforcement failed to help her keep R.K. away, and purportedly based on law enforcement's advice, J.K. called child protection services in March of 1997 and voluntarily surrendered her children for their protection.
On March 26, 1997, Cheryl James, a Child Protection Investigator for the State's Department of Social Services, Office of Community Services (OCS), sought and obtained an oral instanter order from a judge of the Fourteenth Judicial District Court in Calcasieu Parish to take K.K. and C.K. into protective custody. In her affidavit in support of the instanter order, Ms. James recited the following investigated facts:
The father, [R.K.] spanked the children with a paint stick and left bruises on their buttocks and he does not have the ability to care for the children due to chemical abuse and/or mental illness.
The mother, [J.K.] is unable to protect the children from further harm by the father and herself. Further, [J.K.'s] mental state has deteriorated drastically in the last few months.
The agency's contacted the paternal grandmother who refused to get involved and the agency was unable to locate relatives in Texas.
After issuing the oral instanter order, the trial court set a continued custody hearing for April 1, 1997. At the April 1 hearing, the State, through the District Attorney's office, filed a petition requesting an adjudication that the "children are Physically Abused and Neglected Children in Need of Care ... and further, that a date and time should be fixed by this Court for a hearing on this matter."[1] Attached to the petition was the same affidavit submitted in support of the instanter order, and a "parental notice" advising J.K. of the seriousness of the suit filed against her, and her right to an attorney.[2] J.K. was not represented by counsel at the *110 hearing. When asked by the judge whether she wanted an attorney, she replied "no, sir."
The trial court issued a judgment maintaining custody with OCS, and adjudicating the children as "Physically Abused and Neglected Children in Need of Care, pursuant to Title VI of the Louisiana Children's Code, and by virtue of admission to the allegations in the petition." Subsequently, at the dispositional hearings held on May 1 and September, 1997, the trial court rendered judgment maintaining custody of the two children with OCS and approving the OCS case plan goal of family reunification.
Pursuant to the OCS case plan, J.K. underwent a psychological evaluation by Dr. Sam Williams, a clinical psychologist. Specifically, Dr. Williams evaluated J.K. on May 14, 1997, and concluded that she was suffering from chronic depression, present since childhood. According to Dr. Williams, J.K. was abandoned by her mother at the age of seven months and adopted at the age of two years. J.K.'s adoptive father was physically abusive to her, and her mother was mentally and emotionally abusive. Additionally, Dr. Williams believed that J.K. was suffering from a chronic self-defeating personality disorder. According to Dr. Williams, J.K. "[had] come to believe that she kind of deserves the worst in life." In terms of strengths, Dr. Williams found that J.K. was an intelligent, sensitive woman who had a legitimate concern for her children.
Using Dr. Williams' evaluation conclusions, OCS authorized twelve therapy sessions with Dr. Ann Pittman Menou, another clinical psychologist, between July and December of 1997. J.K. missed two of her therapy sessions, and, when the sessions ended, Dr. Menou found that she was making progress in facing her problems. However, Dr. Menou advised OCS that the twelve sessions were not enough. OCS refused to authorize additional therapy, but offered to refer J.K to therapy available at minimal cost for additional treatment. J.K. refused the referral and instead sought psychiatric treatment with Dr. Paul Matthews.[3]
At the third and fourth dispositional review hearings on April 24 and September 9, 1998, OCS changed its case plan goal from reunification to relative placement. The trial court approved this new case plan goal and continued the children in the custody of OCS. Additionally, the judgment from the September 9 hearing ordered court-appointed counsel for J.K.
By this time, the foster home placement of both children had been changed a number of times and both children were located more than one hour from Lake Charles, Louisiana, with K.K. in a foster home in Lafayette, Louisiana, and C.K. in Louis Infant Center in Houma, Louisiana, a group residential facility. In late November 1998, K.K. was transferred to a foster home in Marrero, Louisiana, near New Orleans. According to Dawn Mahoney Becton, the OCS worker assigned to the case since March of 1997, this move was accomplished in contemplation of the new foster family adopting K.K.
The Family Team Conference report by OCS dated September 8, 1998, provided a summary of the case plan. The report indicated that J.K. kept OCS informed of her whereabouts, attended visitation with her children, attended domestic violence classes at the Woman's shelter, and provided information on potential placements in compliance with the OCS case plan. However, J.K. failed to attend therapy, take her medication, participate in medication monitoring, attend parenting classes, or attend a Domestic Violence Treatment Program.
OCS filed a petition to terminate R.K. and J.K's parental rights on May 28, 1999. *111 A subsequent dispositional hearing was held on September 21st, 1999, at which the trial court approved OCS' change in its goal plan from relative placement to adoption. The trial to terminate parental rights began on December 1, 1999. At trial, OCS offered the testimony of the mental health professionals and social workers involved in the case.
The children were first placed under the care of Dr. Patricia D. Post, a clinical psychologist. Dr. Post saw the children together on July 3, 1997, and followed them individually through July, August and September of that year. Dr. Post described the children as "very traumatized" and "very disturbed" children. She testified that C.K. has a diagnosis of severe oppositional defiant behavior; general anxiety disorder; and ADHD, combined type. She described lying, destructive, and stealing behavior on the part of the children and explained that they had no restraint of impulses and exhibited cruelty to animals. Dr. Post testified: "The kids have been exposed to a lot of violence, and they have wounds from that." She believed that the violent relationship with R.K. was a factor in the children's behavior problems. However, she also concluded that some of the problems exhibited by the children were inherited, such as the ADHD. She went on to state that the children's problems were "a combination of physiologically based difficulties and environmentally induced problems, and they have coalesced in this case to be quite severe." She admitted that removal from J.K. "undoubtedly" was a factor in the children's difficulties, but she also testified that the removal did not explain the degree of the children's behavior.
Deanna Miles, a clinical social worker, began counseling K.K. on a weekly basis after her transfer to Marrero. Ms. Miles testified that K.K. had been through four failed placements before the final move to Marrero and confirmed that the child had been told by the OCS worker that she would be adopted by her foster parents in Marrero. Ms. Miles testified that K.K. was diagnosed with attention deficit/hyperactivity disorder (ADHD), combined type; depressive disorder; anxiety disorder; and disruptive behavior disorder. According to Ms. Miles, at the time of her involvement with the child, K.K. was displaying abusiveness toward animals, angry behavior, antisocial behavior, "[s]ad" behavior, self-mutilation, hyperactive behavior, and oppositional behavior. She described K.K. as being attention seeking, argumentative, demanding, very impulsive, and very manipulative. Further, she reported that K.K. had difficulty with separation, tended to disassociate when under stress, was fearful, had a poor self-image, and had nightmares. Ms. Miles was of the opinion that the abusive relationship between J.K. and R.K. resulted in K.K.'s present difficulties and behavior.
J.K. also testified at the trial. During her testimony, she revealed that R.K. was her third husband. J.K. had previously married for the first time at age 18 and had two children. She effectively abandoned these children when they were three and four years old to the care of their paternal grandfather; however legal custody was never transferred. J.K subsequently moved to California and married her second husband. J.K.'s second husband had also been abusive, resulting in the death of one of her two daughters produced during that marriage.
On cross-examination, she admitted living with the defendant as late as August 1999, after the petition for termination of parental rights.[4] She explained her failure to contact relatives for assistance as a fault of pride. While acknowledging that the children needed stability, she disagreed that the children have severe emotional problems that could not be rectified *112 if allowed to return to her. In discussion of her medical problems, she revealed that her psychiatrist, Dr. Matthews, had diagnosed her a manic depressive and prescribed medications. However, when discussing her plans to reunify with her children, she announced that gradual removal of the medication would allow her to care for her children.
She also admitted that she had lived in seven different places and held five jobs since surrendering her children, but she attributed those circumstances to repeated stalking by R.K. She asserted that her circumstances would change if her children were returned to her because relatives were available to help her now, and R.K. would be in jail, and thus, unable to stalk her. However, she admitted that she had not been terminated from any of her jobs; rather, she quit her jobs to get away from R.K. She also explained that lack of money prevented her from pursuing legal remedies or filing for divorce from R.K.
Following the trial, the trial judge ruled orally from the bench. Despite the grounds for termination alleged by OCS, in terminating J.K.'s parental rights, the trial court based the termination on La. Ch.Code art. 1015(3)(i), stating the following in part:
The Court has heard a couple days of testimony in this and has read over all of the submissions by [J.K.'s attorney], which certainly show a great deal of interest by [J.K.'s] family in trying to be of some help in this matter. The Court was particularly impressed with Ms. Miles' testimony when she testified about the special needs of the children, particularly [K.K.]. And the Court's concern, of course, is that those children can be where they can be best taken care of because the best interest of the children is what is supposed to be the Court's responsibility. ... I feel like that the cause of [J.K.'s] history of continuing to return to [R.K.], even after the termination of parental rights petition was filed, makes me know that it's going to be difficult for her to be rehabilitated in the future because of her past history. And based on that, I feel like it's the best interest of the children that the parental rights of [J.K.] and [R.K.] both be terminated. ...
... And I guess to make a specific finding on the grounds under which I find this should be done is under Children's Code Article 1015, 3[i], which finds that, you know, there's abuse or neglect which is life-threatening or gravely disabling, psychological injuries for the children. I think that's obviously what happened and I think that since I don't feel like that there's any reasonable expectation of a significant improvement in [J.K.'s] condition or conduct in the near future that would allow the children to be returned to her is the basis upon which I terminate the parental rights.
Following its oral ruling, the trial court issued a written judgment on January 5, 2000 terminating "all parental rights and obligations of [J.K.] and [R.K.] to [C.K.] and [K.K.] ...," ordering that the children remain in the custody of the State in their current placements until adopted, and suspending visitation between the siblings until recommended by Ms. Miles. The trial court also ordered transcripts of Ms. Miles be made available to those relatives who expressed interest in applying to adopt the children and that they apply within thirty days of the hearing, by January 16, 2000, to be considered along with any other application by OCS pursuant to its guidelines.
J.K. appealed. On appeal, the Third Circuit found the trial court erred in failing to appoint an attorney for her for more than two years prior to the filing of the petition to terminate parental rights, rendering the transfer of custody to the State invalid for lack of due process. The court of appeal also determined that the evidence was insufficient to support the trial court's decision to terminate J.K.'s parental rights. Based on these conclusions, the *113 Third Circuit remanded the case to the trial court to consider relative placement. We granted the State's and the children's attorney's writs to review the correctness of that decision. State in the Interest of C.J.K. and K.K., 00-2375 (La.9/13/00), 767 So.2d 700, consolidated with State in the Interest of C.J.K. and K.K., 00-2504 (La.9/13/00), 767 So.2d 700.

ANALYSIS

Proceedings to Terminate Parental Rights
We recently discussed the unique concerns present in all cases of involuntary termination of parental rights in State in the Interest of J.A., 99-2905 (La.1/12/00), 752 So.2d 806:
In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship. However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. The State's parens patriae power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven.
State in the Interest of J.A., 752 So.2d at 810-811 (citations omitted)(emphasis added).
Title X of the Children's Code governs the involuntary termination of parental rights. To assist the court in determining whether a parent is unwilling or unable to adequately care for a child's physical, emotional, and mental health needs, La. Ch. Code art. 1015 provides the specific grounds for involuntary termination of parental rights. The State must only establish one ground under La. Ch.Code art. 1015, but the judge must also find that the termination is in the best interest of the child. La. Ch.Code art. 1039. Additionally, the State must prove the elements of one of the enumerated grounds by clear and convincing evidence to sever the parental bond. La. Ch.Code art. 1035(A); Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that the minimum standard of proof in termination of parental rights cases is clear and convincing evidence).
In this case, OCS sought termination of R.K.'s parental rights under La. Ch.Code art. 1015(5).[5] OCS was authorized to file *114 the petition by La. Ch.Code art. 1004(D), which provided at the time the petition was filed, when as a result of a prior child in need of care disposition, termination is authorized by Article 1015(5).
However, the trial court terminated the parental rights of R.K. and J.K. based on La. Ch.Code art. 1015(3)(i) which provides as a ground for termination:
(3) Misconduct of the parent toward this child or any other child of the parent or any other child in his household which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
. . . .
i) Abuse[6] or neglect[7] which is chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement.
The court of appeal concluded that the only assertion of physical abuse in this case is that committed by R.K., finding no evidence of physical abuse, or knowledge of physical abuse, by J.K until after the incident by R.K. that set in motion the proceedings with OCS.[8] Thus, the court of appeal concluded that only the only alleged abuse by J.K. could be the infliction, attempted infliction, allowance, or toleration of the infliction of mental injury upon children by a parent as a result of inadequate supervision. The court of appeal appeared to focus on Dr. Williams' and J.K.'s testimony that she loves her children and sought to protect them when she perceived that they were in danger.
However, we must continue to stress that the Legislature has expressed its intent that courts shall construe the procedural provisions of Title X of the Children's Code relative to the involuntary termination of parental rights liberally. La. Ch.Code art. 1001. We conclude that the lower court erred in failing to recognize that passive abuse or neglect by a parent can inflict just as, if not more so, "gravely disabling" injury as physical abuse. The trial court found that J.K.'s apparent inability to protect her children from witnessing the abuse resulted in severe psychological trauma, and based on her inability to reform that behavior, both pre- and post-custody with OCS, the trial court properly concluded that the best interests of the children would be served in terminating both R.K. and J.K's parental rights.
*115 As we recognized in State in the Interest of J.A., "the Legislature defined a "neglected" child in broad terms precisely because foreseeing all the possible factual situations that may arise is impossible." 752 So.2d at 813. Further, the broad definition enables experienced juvenile courts to apply their training and experience to the unique facts and circumstances of each case. Id.
Although J.K.'s testimony reveals efforts on her part to obtain help for herself through restraining orders and law enforcement, the record also demonstrates her inability to follow through with any attempt to stay away from her husband. In fact, the overwhelming evidence by mental health professionals and her own admissions supports the finding that she sabotaged her own efforts to rehabilitate, for example, by refusing to participate in further therapy to allow OCS to determine compliance with her case plan, and returning to her husband on numerous occasions, including contacts initiated by her, even after the petition to terminate her rights had been filed.
Dr. Williams related that J.K.'s behavior is consistent with her mental diagnosis of chronic depression and self-defeating personality disorder. He diagnosed J.K. as having a "self-defeating personality disorder," which he described as a "habitual and entrenched pattern of behaving, thinking, [and] feeling" in which the person "chronically ... sabotages their [sic] own good fortunes. They continually shoot themselves in the foot ... and have a hard time maintaining a healthy, happy, harmonious type of life. ..." Dr. Williams did not think that it would be reasonable for the children to return to J.K. until there was "good reason" to believe that she had changed. He opined that two or more years of intensive treatment with stability and avoiding the violence would be necessary before a consideration of returning the children to her, even with the offer of relative assistance. While a finding of mental illness, standing alone, is insufficient grounds to warrant termination of R.K..'s parental rights, La. Ch. Code art. 1015, a mental deficiency related to the parenting ability is relevant in determining the role of the mother in abuse or neglect of the children. State in the Interest of J.A, 752 So.2d at 814.
J.K. engaged in a pattern of returning to R.K. both before and after the children were out of her custody. In fairness to J.K., she was under the impression initially that OCS was encouraging the reconciliations, but OCS clarified its position to her. Moreover, Dr. Williams testified that J.K. "was very, very aware that ... there was a heavy contingency between her own assessment of her readiness to get them back ... and her relationship with [R.K.] and keeping him out of her life."
Our review of the record supports the trial court's finding of clear and convincing evidence that J.K. participated in passive abuse, namely that she allowed or tolerated the infliction of mental injury on her children. Whether termed abuse or neglect, the evidence overwhelmingly indicates that the children suffered severe trauma from their repeated exposure to violence perpetrated by R.K. on J.K. We further conclude that the trial court did not err in finding that the children suffered life-threatening and severely disabling psychological injury that in their best interests required termination of J.K.'s parental rights.
Ms. Miles testified that K.K. needs stability and needs to feel safe. She also testified that it would be "[v]ery, very important" that K.K. not witness violence toward a caretaker at this point and that "[i]t would be very detrimental to her" to be placed in an environment where her caretaker was the subject of physical abuse. Dr. Post was of the opinion that the children need stability and permanency and stated that it would be "crucial" for the children to be free from violence. She testified that her only concern was that J.K. continued to go back to R.K., and she explained: "[T]hey're already so traumatized *116 that exposing them to more of that possibly seems to outweigh the fact that they might be able to be with her ... because they're so disturbed. ..." Dr. Williams was also of the opinion that the children need security and stability. Dr. Menou testified that her main concern for the children would be that they not return to J.K. because J.K. may continue the relationship with R.K. and the children would be subject to the same abusive environment that they were in initially.
We are cognizant that domestic violence and child abuse or neglect are often related problems within the same dysfunctional family.[9] While we recognize that the battered woman in the relationship is the victim, and a pattern of returning to the batterer is common,[10] we must also accept the legislature's mandate that the children are the paramount concern.[11] In the unique facts of this case, the trial court found that because the children had suffered such severe psychological trauma, J.K.'s repeated returns to R.K., and high risk of continuing to do so, constituted neglect that is "chronic, life threatening, or results in gravely disabling physical or psychological injury or disfigurement." La. Ch.Code art. 1015(3)(i).
We disagree with the court of appeal's conclusion that OCS did not adequately provide necessary services for the safe return of the children. OCS is a governmental agency with thousands of cases and finite resources. According to Ms. Becton, the twelve-session restriction was placed in advance of Dr. Menou's treatment. J.K.'s apparent need for long-term assistance and support to break the cycle of abuse in her life was not contingent upon OCS providing all the financial assistance and effort to ensure that this in fact occurred. J.K. presented no evidence of her efforts to pursue further therapy or obtain financial assistance, despite her awareness of the case plan's requirements to achieve reunification with her children.
We believe the court of appeal was swayed by the moving letters provided by relatives and former relatives of J.K. The letters from relatives introduced into evidence demonstrated a desire and potential ability to care for the children.[12] While we too are concerned that the children be placed with relatives as opposed to strangers, we note that it is OCS's role, and not the courts, to determine placement of the children after the termination of parental rights. See La. Ch.Code art 1040; La. Ch.Code art. 672; State in the Interest of Sapia, 397 So.2d 469 (La.1981). The existence of relatives is generally irrelevant to the termination of a parental rights, as noted and objected to by the *117 State and the children's attorney during trial.[13] Rather, the letters are relevant to the trial court's approving placement in accordance with the best interest of the children, upon submittal by OCS during placement proceedings.

Other Assignments of Error
In their appellate briefs, OCS, the district attorney, and the children's attorney urge that grounds for termination of parental rights have in fact also been established under La. Ch.Code art. 1015(5). As set forth above, the trial court did not base the termination of parental rights on that section of the Article, although it did make a factual finding on an element of that provision, i.e., that there was no reasonable expectation of significant improvement in J.K.'s conduct in the near future that would allow the children to be returned to her. Because we agree with the trial court's determination under La. Ch. Code art. 1015(3)(i), we pretermit a discussion of the grounds for termination under La. Ch.Code art. 1015(5).
Accordingly, this court exercises its supervisory jurisdiction to order that this case proceed expeditiously and, to the extent practicable, that OCS shall provide a detailed report to the juvenile court within fifteen days from this judgment becoming final to address permanent placement for the children pursuant to Ch. C. art. 1040. See Ch. C. art.1001.1 (mandating that any petition or proceeding filed or held under the provisions of the Children's Code be given priority).

CONCLUSION
For the foregoing reasons, we reverse the judgment of the court of appeal. We affirm the trial court's termination of J.K.'s parental rights and remand for further expedited proceedings to determine placement in accordance with OCS guidelines.

DECREE
Accordingly, we vacate the Third Circuit Court of Appeal judgment reversing the termination of J.K.'s parental rights and awarding costs of the appeal against the State. The case is remanded to the trial court for further expedited proceedings consistent with this opinion.
VACATED AND REMANDED WITH INSTRUCTIONS FOR EXPEDITED TREATMENT.
NOTES
[1] Although the trial court signed an order on April 1 fixing a hearing on the petition for May 1, 1997, this appears to be an error, because the judge entered an admission by J.K. to the allegations in the petition at the April 1 hearing, and adjudicated the children in need of care. As apparent from the transcript of the April 1st continued custody hearing, that adjudication converted the May 1st hearing into a dispositional hearing.
[2] The parental notice provided the following:

Louisiana law provides that you can lose some of you [sic] parental rights regarding your child under certain circumstances. Suit has been filed which claims that your child is in need of care, and at hearing will be held to determine whether these circumstances exist. If the court rules that your child is being abused or neglected, as defined by Louisiana law, your rights to have custody of your child, to visit your child, or to make decisions affecting your child will be seriously affected. You may also become liable for paying the costs of your child's care if custody is awarded to some other individual or to the state.
You have the right to an attorney and are encouraged to do so. When you come to court, if you can not afford to hire an attorney, you may qualify to have the court appoint one for you at state expense.
Whether or not you decide to hire an attorney, you have the right to attend the hearing of your case and must attend as summoned, and the right to call witnesses on you [sic] behalf, and to question those witnesses brought against you.
[3] Dr. Matthews did not testify at trial. In addition, J.K. refused to authorize release of her medical records or provide information to OCS to determine compliance with her case plan, on the advice of counsel, in September of 1998.
[4] This fact was verified by certified correspondence, return receipt requested, from OCS mailed to R.K.'s home in August 1999, which was signed by J.K. She explained that he was never there "90% of the time."
[5] La. Ch.Code art. 1015(5), which provides:

The grounds for termination of parental rights are:
. . . .
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.
[6] La. Ch.Code art. 1003(1) defines abuse as:

[A]ny of the following acts which seriously endanger the physical, mental, or emotional health and safety of the child:
(a) The infliction or attempted infliction, or, as a result of inadequate supervision, the allowance or toleration of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person.
[7] La. Ch.Code art. 1003(10) further defines neglect as:

[T]he refusal or failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health and safety is [sic] substantially threatened or impaired.
[8] We note on review that Dr. Miles indicated reports from K.K. of several instances of abuse by her father during therapy. Additionally, in a petition for protective order file by J.K. in 1995, J.K. placed a check by the question on "abusing petitioner's children."
[9] See, e.g., Charging Battered Mothers with Failure to Protect: Still Blaming the Victim, 27 FORDHAM URB. L.J. 849 (2000); Lesley E. Daigle, Empowering Women to Protect: Improving Intervention with Victims of Domestic Violence in Cases of Child Abuse and Neglect; A Study of Travis County, Texas, 7 TEX. J. WOMEN & L. 287 (1998).
[10] Ms. Miles explained that the studies indicate that it is not common for abused women to leave at the very first violent attack and that often they endure many attacks prior to leaving. She also opined, even after leaving, the abused woman will ultimately return. Dr. Menou explained that, typically, with battered women "there is some length of time where there's [sic] separations and reunifications," and she felt the prognosis for J.K. remaining away from her husband was poor. Dr. Post testified that "[i]t's not an uncommon pattern to repeatedly go back [into an abusive environment] for lots of reasons."
[11] We also point out the legislature's recognition of, and provisions for, domestic violence and "its complex legal and social problems." See La. Ch.Code art. 1564-75.
[12] Jy.F., J.K.'s oldest child and the half-brother of C.K. and K.K., submitted a letter expressing his desire and ability to provide a home for the children. Jy.F.'s paternal aunt, S.C., submitted a letter expressing her desire and the desire of her husband to share their home with K.K. J.K.'s oldest daughter and the children's half-sister, Jr.F., lives in S.C.'s garage apartment. In addition, other relatives of Jy.F., former in-laws of J.K. by her first husband, submitted letters supporting their prior ties to J.K. and her two children and their interest in maintaining family ties.
[13] The trial court allowed the letters from relatives to go to the weight of the evidence apparently in rebuttal of the State's proof that J.K. lacked a support system to adequately care for the children.